(No. 22692.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JESSE BINGA, Plaintiff in Error.

*Opinion filed February 21, 1935—Rehearing denied April 10, 1935.*

JOHN F. CASHEN, JR., for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, and HENRY E. SEYFARTH, of counsel,) for the People.

Mr. CHIEF JUSTICE JONES delivered the opinion of the court:

Jesse Binga was convicted in the criminal court of Cook county for embezzling $22,000 and has sued out a writ of error.

The bill of particulars filed on defendant's motion sets out five transactions. Each charges an embezzlement from the Binga State Bank, as follows: (1) $6500 on December 14, 1928, by means of a note signed by John Holloman, Robert Holloman, Philip M. Grant and A. J. Pullen; (2) $8000 on December 14, 1928, by means of a note signed by Charles E. Worthington; (3) $10,000 on June 20, 1929, by means of two notes of $5000 each signed by Maurice Anderson, John H. Minor, Cyril L. Duprey and Robert Armstrong; (4) $7500 on June 20, 1929, by means of a note signed by Henry M. Shackelford; and (5) $500 on December 16, 1929, by means of a note signed by the Cottage Grove Manufacturing Company. The transaction involving the Cottage Grove Manufacturing Company note was abandoned by the People.

The Binga State Bank was located in a section of Chicago largely populated by negroes and the witnesses and nearly everyone concerned were of that race. Binga was the president of the bank. Inez V. Cantey was his secretary and had charge of his real estate books and private records. She was also a director of the bank. C. N. Langston was cashier. The bank is now in the hands of a receiver.

The testimony in behalf of the People concerning the Holloman transaction mentioned in the bill of particulars tended to show that John Holloman was president of a life insurance company which had been called upon to make an additional deposit of $6500 in securities with the State Insurance Department. Holloman and other officers of the

company went to the Binga State Bank in an effort to procure securities in that amount. Their negotiations were with Binga, who turned over to them sufficient securities and took from them a note for $6500. A loan check on the bank was made out for that amount by the cashier, payable to the order of John Holloman. It was endorsed, "John Holloman per P. M. Grant.—Philip M. Grant." Grant was treasurer of the insurance company. No money was advanced to Holloman or his associates but the check was deposited in Binga's account in the bank. The note was not paid when due and was renewed by the execution of another note. Later, Binga demanded payment of this note or the return of the securities. The securities were returned and the note was surrendered, thus depriving the bank of an asset which was placed in it to cover the withdrawal of $6500 which went into Binga's account.

The next item mentioned in the bill of particulars is the Charles E. Worthington transaction. He was a photographer and a tenant of Binga's. Binga sent for him just before Christmas in 1928 and stated that he had a proposition which he wanted to put over and was endeavoring to get the signatures of some of his tenants; that Worthington had been a tenant a long while and defendant had never done for him as much as he had for some of the other tenants; that if Worthington would give his signature as requested Binga would credit him with a month's rent ($60) as a Christmas present. Worthington stated he had great confidence in Binga and signed what he thought was a blank piece of paper and was given credit for a month's rent, and that at different times thereafter he signed other papers for Binga. He claimed he did not know that they were promissory notes, and was not made aware of the fact until the receipt of notice from the receiver of the closed bank. When the bank closed the receiver came into possession of Worthington's note for $8000. With it was a collateral note and second mortgage signed by Adolph

Dandridge and his wife. Dandridge was Binga's nephew. The People's testimony tended to show that the collateral was insufficient security for the note. Miss Cantey testified that the day Worthington signed the note a loan check was issued for $8000, and that she was instructed by Binga to obtain $8000 in currency from the bank and place it in Binga's safety deposit box. She did as directed. Some time afterwards he told her to put $2000 of that sum to his credit in the real estate account and $3500 to the credit of the bank as a commission on a loan on the Arcade building, in which the bank was situated. His cash book shows that he made disbursements of the entire sum and thereby received the full benefit of the proceeds of the loan check.

The third item mentioned in the bill of particulars relates to two notes aggregating $10,000 signed by Maurice Anderson and certain of his associates who were interested in the Commonwealth Burial Association. They consulted defendant about a loan, and as a result they executed two notes for $5000 each, signed by Minor, the president, Armstrong, the treasurer, Duprey, the secretary, and Anderson, the manager of the association. Loan checks were issued in this instance and endorsed by the makers of the notes. No money, however, was paid to the signers. Nearly two months later they went to the bank and asked Binga for the notes if they were not to receive the money. He said he had been advised not to make the loan and had destroyed the notes as worthless. Some time after this date, Armstrong, at Binga's request, went to the bank. Binga informed him that he was now ready to make the loan and to assist in promoting the association, but as a condition thereto he desired to put Dr. Wilson on the board of directors as treasurer. This plan was agreed to and two notes were executed, each for $5000, bearing the signature of the Commonwealth Burial Association, by Minor as president and Armstrong as secretary and treasurer. Binga informed Armstrong that he could not advance the

money at that time, as it would be necessary for the association to adopt a budget. The budget was made up but Binga never advanced the money. ` It does not appear that any loan checks were made in relation to these notes, but the cashier of the bank testified that Binga told him he was making the loan and wanted two cashier's checks made out in different amounts but aggregating $10,000. The cashier complied with this request, and their proceeds were traced into the possession of Binga in connection with the fourth item mentioned in the bill of particulars.

The fourth item concerns the Shackelford note. Shackelford was an employee of the bank and had bought some real estate through Binga. He was unable to pay the full purchase price and gave a mortgage or trust deed to secure the balance. The receiver of the bank came into possession of a loan check for $7500 which purported to bear Shackelford's endorsement. Shackelford testified that he never received the $7500; that he never received a notice at any time from the bank with respect to interest or the payment of any indebtedness growing out of the transaction and that he knew nothing whatever about it. Miss Cantey testified that she had seen a note for $7500 which bore Shackelford's signature, and that upon the direction of the defendant she obtained the cash on the loan check. At the same time she also obtained cash on the two loan checks as above mentioned in the burial association transaction. The total amount thus obtained was $17,500. Prior to obtaining the cash, she said, Binga told her to use it by taking up the $17,000 check drawn against his personal account in the purchase of the old Kenwood National Bank building and to place the remaining $500 to his credit for commissions. The $17,000 check drawn against Binga's private account had been carried in the bank as an item of "exchange for clearing" for approximately one month. The books show that an item of $17,000 had been carried during that period as "exchange for clearing."

The defendant testified in his own behalf and specifically denied the embezzlement of any money. He testified he never directed Miss Cantey to draw the $17,000 check in payment of the purchase price of the Kenwood National Bank building, and that he knew nothing about the check until he heard her testimony relating to it. He also testified that he never induced Holloman and his associates to sign any notes in blank or without dates; that he never had anything to do with the details of their transactions, nor did he induce Worthington to sign any blank piece of paper; that Worthington's notes were accommodation paper signed by him for the purpose of replacing certain doubtful or worthless notes in the bank that had been ordered withdrawn by the Auditor of Public Accounts. He asserted that Anderson and his associates got the proceeds of the $10,000 loan made to the burial association. His version of the deposit of the $6500 obtained through the Holloman loan was that he was handling a large amount of real estate belonging to the bank and that rents collected from such real estate were deposited in his rent account and that the bank ultimately received the proceeds of that loan.

The first error assigned for reversal is that the court erred in admitting evidence of what is known as the Thurman transaction, which was not included in the bill of particulars. This evidence was heard in connection with the Holloman transaction. It appears that Thurman was janitor at the bank and had been quite thrifty. He had talked with Binga about buying a farm, and when the bank closed the receiver came into possession of a note for $6500 purporting to have been signed by Thurman and collaterally secured by certain mortgages and bonds. Thurman testified that he did not receive any money on the note; that he did not know of its existence until after the bank had gone into the hands of the receiver, and that he never owned or had any interest in the collateral. He knew he had signed a paper but thought it was an application to

buy a farm. This testimony finds corroboration in the testimony of Langston, the cashier. The mortgages which were deposited as collateral securities for the note were executed by Charlotte Smith, a switch-board operator in the bank. The evidence shows that Binga was the real owner of the mortgaged property. The testimony for the People tends to show that it was not worth anything in excess of $4000. It is true this transaction is not mentioned in the bill of particulars, but the testimony of Miss Cantey, as well as the records of the bank, make it apparent that when Holloman made a return of the securities which had been loaned to him and his associates he procured their $6500 note. Binga had received the proceeds of the loan check, and in order to make the books of the bank balance, the Thurman note for like amount was placed among the assets. The embezzlement, if any, was not effected by means of the Thurman note but by means of the Holloman note, and the substitution of the Thurman note for the Holloman note was so connected with the Holloman transaction that the evidence concerning such substitution was properly laid before the jury.

It is urged that the bank records show that all the transactions complained of were approved by the board of directors, and therefore Binga cannot be said to have fraudulently embezzled the money from the bank without its consent. The records of the bank do show that the loans were afterwards approved by the board of directors, but there is no testimony tending to show that any director other than Binga had any knowledge that the loans were not *bona fide*. When a bank official is guilty of embezzlement of the funds, a subsequent approval of his fraudulent acts, even if knowingly done, cannot exonerate him. Such a defense was presented in *McKnight* v. *United States,* 115 Fed. 970, and the court said: "We are not willing to sanction a doctrine which prevents conviction of embezzlement because the funds were converted with the consent of the

board of directors, unless it appears to have been given with good faith and with knowledge of the facts."

While there was testimony of the good reputation of the defendant prior to the charge laid in the indictment, we cannot say that the evidence did not show his guilt beyond all reasonable doubt. The jury had before it the records of the bank and the testimony of all the witnesses. We have reviewed that testimony and are convinced that it fully supports the verdict. No substantial error appears in the record, and the judgment of the criminal court is therefore affirmed.

*Judgment affirmed.*